UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GBM Global Holding Company Limited<br><br>*Petitioner*,<br><br>v.<br><br>The Unidentified Individuals Listed On Schedule A,<br><br>*Defendants*. | Case No. 1:21-cv-06284-AJN |

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION FOR A TRO AND SHOW CAUSE ORDER**

Petitioner GBM Global Holding Company Limited ("**Petitioner**") respectfully submits this supplemental memorandum of law in response to the Court's questions during the July 27, 2021 hearing on Petitioner's Motion for a TRO (the "**Motion**"). This brief will address the Court's questions raised in sequence.

**ARGUMENT**

**I.      Pre-Arbitration Entitlement To Preliminary Injunctive Relief**

As the Second Circuit has long held, "Arbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990). Accordingly, "a district court has authority to entertain an application for pre-arbitration injunctive relief, even if the merits are subsequently submitted to arbitration." *Gruntal & Co., L.L.C. v. Maharaj*, 13 F. Supp. 2d 566, 568 n.1 (S.D.N.Y. 1998); *see also Leber v.*

1

*Citigroup, Inc.*, 2019 U.S. Dist. LEXIS 49213, at *3 (S.D.N.Y. Mar. 25, 2019) (explaining that "[a] review of relevant Second Circuit case law reveals that district courts may indeed grant pre-arbitration relief . . . in the form of an injunction to preserve the status quo ….") (citing *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895-96 (2d Cir. 2015) ("Where the parties have agreed to arbitrate a dispute, a district court has jurisdiction to issue a preliminary injunction to preserve the status quo pending arbitration.")).

Courts have long held that a district court retains authority to entertain preliminary injunctive relief when compelling arbitration—a situation in which the court is ***necessarily*** presiding over injunctive relief prior to the filing of arbitration. Indeed, "the Second Circuit, this principle dates back decades, and district courts have been reversed where they have adopted the erroneous view that the 'decision to refer the dispute to arbitration strip[s] the court of power to grant injunctive relief.'" *Gen. Mills, Inc. v. Champion Petfoods United States, Inc*., 2020 U.S. Dist. LEXIS 32924, at *8 (S.D.N.Y. Feb. 26, 2020) (citing *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of N. Y.*, 749 F.2d 124, 125 (2d Cir. 1984)); *see also Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 376 (4th Cir. 2012) (reversing where district court compelled arbitration but declined to rule on a preliminary injunction motion on the basis of mootness.); *Stemcor USA Inc. v. CIA Siderurgica do Para Cosipar*, 927 F.3d 906, 910 (5th Cir. 2019) (holding that "pre-arbitration attachment 'may 'serve[ ] ... as a security device in aid of arbitration.'")

Indeed, even if the Court does not find explicit textual authority under Rule 65 of the federal rules to enjoin transfers pre-arbitration, it certainly has authority under Rule 64 to freeze the subject cryptocurrency prior to the commencement of arbitration. Rule 64 makes available "every remedy … that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." FRCP 64.

Rule 64 thus makes available New York's CPLR § 7502(c), which allows the Court to:

> entertain an application for an order of attachment or ***for a preliminary injunction*** in connection with an arbitration that is pending ***or that is to be commenced inside or outside this state***, whether or not it is subject to the United Nations convention on the recognition and enforcement of foreign arbitral awards, but only upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief.

CPLR § 7502(c) (emphasis added).

## II.   Subject-Matter Jurisdiction Arising From the New York Convention

Under the New York Convention (the "Convention"), the Court has subject matter jurisdiction over this petition for preliminary injunctive relief in aid of arbitration.[1] Chapter 1 the Federal Arbitration Act ("FAA") contains its "general provisions," while Chapter 2 separately implements the New York Convention, governing non-domestic arbitrations. *See* 9 U.S.C. § § 201, *et seq*. Section 203 of the FAA, entitled "Jurisdiction…," makes clear that "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States … shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203.

On the basis of this provision of the New York Convention's implementing legislation, Courts in this district routinely find subject matter jurisdiction over petitions, including for injunctive relief, in aid of non-domestic arbitrations. *See JSC Surgutneftegaz v. President & Fellows of Harvard Coll.*, 2005 U.S. Dist. LEXIS 15991, at *6 n.3 (S.D.N.Y. Aug. 3, 2005) ("[t]he failure of Petitioner to invoke Chapter 2 of the FAA in seeking a stay does not deprive this Court

---

[1] Petitioner respectfully withdraws the CEA as the basis for subject matter jurisdiction stated orally during the July 27, 2021 hearing. While the CEA does offer a private right of action under 7 U.S.C. §25(a)(1), upon further research, that private right of action does not cover spot trades of commodities—as occurred here. *See In re Dairy Farmers of Am. Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 966 (N.D. Ill. 2014) (observing that the CEA distinguishes between spot and futures contracts, and holding that "[t]he CEA … does not provide a private right of action to recover for damages suffered in the trading of spot [] contracts.")

of subject-matter jurisdiction because the applicability of the New York Convention is apparent."); *Espiritu Santo Holdings, LP v. Libero Partners, LP*, 2019 U.S. Dist. LEXIS 84844, at *39 (S.D.N.Y. May 14, 2019) affd, 789 Fed Appx 288 (2d Cir 2020) (premising subject matter jurisdiction to entertain injunctive relief over arbitration arising under the Convention); *Venconsul N.V. v. TIM Int'l N.V.*, 2003 U.S. Dist. LEXIS 13594, at *6 (S.D.N.Y. Aug. 5, 2003) (finding subject matter jurisdiction over request for injunctive relief under the convention and rejecting defendants' argument that "courts can entertain [injunctive] requests only in connection with an action to compel arbitration or to enforce an arbitral award and that this proceeding should therefore be dismissed for lack of subject matter jurisdiction.")

Indeed, 9 U.S.C. § 205 mandates the removal of all petitions covered by the Convention to federal courts. In short, where an arbitration falls under the Convention, *Landau v. Eisenberg*, 922 F.3d 495 (2d Cir. 2019), which addresses domestic arbitrations, is irrelevant.

9 U.S.C. § 202 prescribes the two conditions under which an arbitration would fall under the Convention. ***First***, it provides that "[a]n arbitration agreement or arbitral award arising out of a legal ***relationship***, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in ***section 2 of this title***, falls under the Convention." (emphasis added). Section 2 "of this title," title 9, in turn provides for enforceability of a written arbitration provision in "a contract evidencing a transaction ***involving commerce***." 9 U.S.C. § 2 (emphasis added). Finally, Section 1 of title 9 states that: "'commerce', as herein defined, means commerce among the several States or with foreign nations." 9 U.S.C. § 1.

Interpreting this language, courts have liberally held arbitrations to be "commercial" and thus falling under the Convention where the "relationship" that is the subject matter of the arbitration merely ***implicates*** interstate or international commerce. *See e.g. Scherk v. Alberto-*

4

*Culver Co.*, 417 U.S. 506, 511 n.5 (1974) ("Since the transaction in this case constituted 'commerce . . . with foreign nations,' 9 U. S. C. § 1, the Act clearly covers this agreement."); *Prograph Int'l v. Barhydt*, 928 F. Supp. 983, 988 (N.D. Cal. 1996) (observing that "Section 2 applies to all contracts that Congress could regulate under the full sweep of its Commerce Clause powers."); *Pathak v. Molopo Energy LTD*, 2013 U.S. Dist. LEXIS 142724, at *8 (S.D.N.Y. Oct. 2, 2013) ("[a]ny arbitration agreement that is 'considered as commercial' and is not solely between citizens of the United States falls under the New York Convention."); *David L. Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d 245, 250 (2d Cir. 1991) (holding that "contracts for the purchase and sale of commodities futures in London" "certainly involved international commerce" and the "Arbitration Act's use of the term 'commerce' [is] not limited to interstate or international shipment of goods but applies also to contracts that ***directly affect*** … international transportation of goods.") (emphasis added).

> As one court in this district held in this precise context:
>
> Research has developed nothing to show what the purpose of the "commercial" limitation [in the New York convention, through a reservation made by the United States,] was. We may logically speculate that it was to exclude matrimonial and other domestic relations awards, political awards, and the like. …
>
> It has been said in this connection [that]: "In the case of the United States reservation it seems clear that the ***full scope of 'commerce' and 'foreign commerce'***, as those terms have been ***broadly interpreted***, is available for arbitral agreements and awards.

*Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y. 1973); *affd*, 489 F2d 1313 (2d. Cir. 1973) (citing Quigley, *Convention on Foreign Arbitral Awards*, 58 A.B.A.J. 821, 823 (1972)) (emphasis added).

Numerous Courts presiding over cryptocurrency transactions, including of Bitcoin and similar tokens, have found that they implicate interstate "commerce" ***by nature***. *See e.g. United States v. Costanzo*, 956 F.3d 1088, 1089 (9th Cir. 2020) ("we conclude that the transfer in question,

5

which involved the use of an Internet or cellular network connected Personal Computer … to transfer bitcoin … to the digital wallet of another Internet or cellular network connected [computer], had the necessary effect on interstate commerce."); *CFTC v. Gelfman Blueprint, Inc.*, 2018 U.S. Dist. LEXIS 205706, at *22 (S.D.N.Y. Oct. 15, 2018) ("Defendant … cheated and defrauded, and attempted to cheat and defraud, customers, in connection with contracts of sale of bitcoin, a commodity in interstate commerce."); *CFTC v. McDonnell*, 2018 U.S. Dist. LEXIS 146576, at *144 (E.D.N.Y. Aug. 23, 2018) ("Defendants' fraudulent acts … were in connection with … virtual currencies such as Bitcoin … a commodity in interstate commerce.").

***Second***, 9 U.S.C. § 202 further provides that "[a]n agreement or award arising out of such a relationship which is ***entirely between citizens*** of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." Thus, as this Court held, "[t]he New York Convention and Federal Arbitration Act apply to this petition to confirm an award from a commercial arbitration that ***is not entirely*** between citizens of the United States." *Daum Glob. Holdings Corp. v. Ybrant Dig. Ltd.*, 2014 U.S. Dist. LEXIS 30031, at *4 (S.D.N.Y. Feb. 20, 2014) (emphasis added).

Here, Petitioner, a foreign entity, will shortly commence arbitration pursuant to the arbitration clause in section 10.3 of the agreement that all Defendants accepted when signing up for accounts on its exchange. Ni Supplemental Decl. ¶ 2; Ex. D (the "Agreement"), at 21. That Agreement was "between [the user] and GBM Global Holding Company Limited," a Cayman Islands company. Ex. D, at 1; Wei Li Supplemental Decl. ¶ 1. The internet protocol, or "ip"-addresses of the Defendants, recorded when they transacted on Petitioner's exchange, show mostly foreign origins. Wei Li Supplemental Decl. ¶ 2. In addition, Petitioner's exchange operations are

6

conducted in both the U.S. and China. *See* First Wei Li Declaration, at 4 (technical lead working and signing declaration in "Hangzhou, China.").

Furthermore, the initial hack at hand was (i) perpetrated on BSV, a fully global cryptocurrency with nodes spread around the world; the hackers (ii) then transacted other global cryptocurrencies with at least 144 non-U.S. users on Petitioner's exchange; and (iii) made numerous transfers of stolen cryptocurrency to various global cryptocurrency exchanges. *See* Motion, at 2-4, fn. 2; Wei Li Supplemental Decl. ¶ 3.  In short, the arbitration agreement and the arbitration to be brough under it, arises squarely from a "relationship" implicating international commerce, and will "not entirely [be] between citizens of the United States." *Daum Glob. Holdings Corp.*, 2014 U.S. Dist. LEXIS 30031, at *4. The Court therefore has subject matter jurisdiction pursuant to the Convention.

### III. Service of Notice By E-mail Comports With Due Process For The Purposes Of Injunctive Relief

The service of process provisions of Rule 4 do not govern the provision of notice prior to preliminary injunctive relief under Rule 65. *See e.g. New York State Nat. Org. for Women v. Terry*, 961 F.2d 390, 397 (2d Cir. 1992) ("We conclude that the time constraints of Rule 4(j) do not apply to service in connection with a contempt proceeding arising out of violation of injunctions validly issued pursuant to Fed.R.Civ.P. 65(d).") cert. granted, vacated *sub nom* on other grounds, *Pearson v. Planned Parenthood Margaret Sanger Clinic (Manhattan)*, 507 U.S. 901 (1993), and judgment reinstated, 996 F.2d 1351 (2d Cir. 1993); *Sec. & Exch. Comm'n v. Cap. Growth Co., S.A. (Costa Rica)*, 391 F. Supp. 593, 600 (S.D.N.Y. 1974) ("Notice [for a preliminary injunction] was effectively given even though technically these defendants were not yet properly served with the summons and complaint."); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827,

842 (7th Cir. 2012) (rejecting argument that formal service of process was required prior to granting preliminary injunctive relief under Rule 65.).

Here, the contractual notice provision states that "[y]ou agree and consent to receive electronically all communications, agreements, documents, notices and disclosures … that we provide in connection with your … Account(s) and your use of [our] Services." Ex. D, at 28. Defendants having so contracted to receive "all … notices," e-mail notice is sufficient to meet the requirements of due process for this proceeding. *See* Motion, at 15-16; *see also Zanghi v. Ritella*, 2020 U.S. Dist. LEXIS 20279, at *16 (S.D.N.Y. Feb. 5, 2020) (noting that defendant's "recent use of the address indicates that an email to it is likely to reach him.")

Even if service of process did matter, service of process can be covered by the broad "all notices" provision of the contract at hand. Ex. D, at 28. Indeed, "it is well-settled that 'parties to a contract may agree in advance to … permit notice to be served by the opposing party, or even to waive notice altogether.'" *Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) (citing *National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1964)). As one court in this district held when confronting another broadly worded notice clause, "[a]lthough service of process is not specifically mentioned in [the notice provision], it falls within the category of 'all notices and communications between the parties' in [the same provision]." *Space Sys./ Loral, Inc. v. Yuzhnoye Design Office*, 164 F. Supp. 2d 397, 402 (S.D.N.Y. 2001) (citing cases). The clause here, like in *Space Sys./Loral, Inc.*, was worded broadly to cover "all communications, agreements, documents, notices, and disclosures …". Ex. D, at 28.

### IV. Likelihood of Success and Irreparable Harm

In response to the Court's questions concerning the likelihood of success and the claims that Petitioner intends to assert, Petitioner represents through undersigned counsel that it will assert

8

in arbitration claims for breach of contract, fraud, unjust enrichment, and conversion. Ni Supplemental Decl. ¶ 3. Here, at the very least, Defendants, by using fake identities to deposit fake BSV on Petitioner's exchange and transacting such fake cryptocurrency with innocent users, breached section "9.6. Prohibited Use," which prohibits "Fraud[, including] [a]ctivity which operates to defraud [the exchange, its] users, or any other person," and the provision of "any false, inaccurate, or misleading information" to the exchange. Ex. D, at 14-15.

Finally, in response to the Court's questions about the difficulty of tracing efforts were Defendants to be provided with pre-TRO notice, Petitioner also submits Mr. Wei Li's supplemental declaration, which provide further explanation of the difficulties inherent in tracing cryptocurrency. *See* Wei Li Supplemental Decl. ¶¶ 4-16 (submitted under seal).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Petitioner's requested TRO relief in aid of impending arbitration.

Dated: July 28, 2021

**AFN Law PLLC**

by: _____

Angus F. Ni
41 Madison Ave, 31st Floor,
New York, NY 10017
Phone: (646) 453-7294
angus@afnlegal.com
*Attorneys for Petitioners*

9