UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GBM Global Holding Company Limited<br><br>*Plaintiff*,<br>v.<br><br>The Unidentified Individuals Listed On Schedule A,<br><br>*Defendants*. | Case No. 1:21-cv-06284 |

**MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR
(1) A TEMPORARY RESTRAINING ORDER IN AID OF ARBITRATION;
(2) AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE; AND
(3) AN ORDER AUTHORIZING ALTERNATIVE SERVICE OF THE TRO AND SHOW CAUSE ORDER**

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ........................................................................................ 1

II. RELEVENT FACTS .......................................................................................................... 1

III. JURISDICTION ................................................................................................................. 5

   A. The Court Has Jurisdiction Because Defendants "Transacted Business" In State .............. 5

   B. The Court has Jurisdiction Under CPLR § 302(a)(3) and the Commodities Exchange Act Based On *National* Contacts and Effects ............................................................................... 7

IV. ARGUMENT ..................................................................................................................... 10

   A. Petitioner is Entitled to an *Ex Parte* Temporary Restraining Order Restraining Transfers of the Defrauded Cryptocurrency ........................................................................................... 10

      1. Plaintiff Will Suffer Irreparable Harm in The Absence of The Requested Injunction .. 11

      2. Plaintiff Has Demonstrated a High likelihood of Success on The Merits ..................... 12

      3. The Balance of Harms Tilts Sharply in Petitioner's Favor ........................................... 12

   B. Plaintiff is Entitled to an Order Authorizing Alternative Service of Process .................... 13

      1. Defendants Have Contractually Agreed to The Alternative Means of Service ............. 14

      2. Proposed alternative means of service comport with due process ................................ 15

V. NO BOND IS NECESSARY AT THIS STAGE ................................................................ 16

VI. CONCLUSION.................................................................................................................. 17

Petitioner GBM Global Holding Company Limited ("**GBM**" or the "**Company**"), by its undersigned attorney, submits this memorandum of law in support of an application for a temporary restraining order, order to show cause for preliminary injunction, and authorizing alternative service against the Defendants listed in Schedule A ("**Defendants**").

## I. PRELIMINARY STATEMENT

The Court has jurisdiction to "grant pre-arbitration relief ... in the form of an injunction to preserve the status quo when a dispute is subject to mandatory arbitration pursuant to the Federal Arbitration Act." *Leber v. Citigroup,* Inc., 2019 WL 1331313, at *3 (S.D.N.Y. Mar. 25, 2019) (*quoting Benihana, Inc. v. Benihana of Tokyo*, LLC, 784 F.3d 887, 895-96 (2d Cir. 2015)).  This petition arises out of an impending arbitration between GBM and certain hackers who perpetrated a fraud on it and users of its cryptocurrency exchange BitMart—the user agreement for which contains an arbitration provision. Ex. D, at 21.

GBM respectfully requests that the Court issue an Order temporarily and then preliminarily enjoining: (i) Defendants from transferring cryptocurrency from the exchanges and accounts listed in Schedule B hereto; (ii) the cryptocurrency exchanges listed on Schedule B from authorizing transfers of cryptocurrency from any account listed in the same schedule.

## II. RELEVENT FACTS

**A.    The BitMart Exchange and Bitcoin Satoshi Vision ("BSV") Token**

The Company is the owner of BitMart, a cryptocurrency exchange established in 2018 (https://www.bitmart.com/). Declaration of Daisy Lu Li ("**Daisy Li Decl.**"). ¶ 1. The Company is the parent of Bachi.Tech Corporation ("**Bachi**"), a subsidiary that operates the BitMart cryptocurrency exchange. Bachi is incorporated in New Jersey. *Id.* Bachi runs its operations and has employees in both New York and New Jersey. As a cryptocurrency exchange, over 400 cryptocurrencies are traded on BitMart, including the Bitcoin Satoshi Vision ("**BSV**"). *Id.*, at ¶ 3.

A blockchain is a type of digital database in ledger form. With blockchain technology, information is collected together in groups or blocks and linked together to create a chain of data (the "**Blockchain**"). Declaration of Wei Li ("**Wei Li Decl.**"). ¶ 3. *See* **Ex. A**. In cryptocurrency trading, the blockchain is used to record approved transfers of digital currencies and the mining of crypto coins or tokens. Generally, a new "block" on the chain is created by a "miner" solving complex computational math problems using a stack of computing power. *Id.*

Each new block must then be validated by a consensus of "nodes" or computers attached to the blockchain network that will then verify that the miner's solution to the math problem is correct. Once validated, the newly mined block will be added to the existing blockchain. *Id,* at 4. Transactions of a given blockchain's tokens are recorded in these blocks as they are mined at regular intervals and locked into the chain as the blocks with transaction information is validated by miners. For their mining work, the miners receive the native cryptocurrency of the given blockchain as their rewards —for example Bitcoin. *Id.*, at 5.

Created in 2018, the BSV token is a cryptocurrency that is generated by forking the Bitcoin Cash blockchain (which is itself a fork of Bitcoin) and adjusting the blockchain protocol by using blocks that are larger, which in turn helps to reduce transaction fees. Daisy Li Decl. ¶ 4. Bitcoin Association, a non-profit association, supports the BSV blockchain network and provides infrastructural tools such as the BSV node software. *Id.*

**B.      Malicious Attack on BSV Network on July 9, 2021**

On July 8, 2021, Bitcoin Association announced that it has been made aware of an illegal attack by a malicious actor that has recently been carrying out block re-organisation attacks on the BSV network. Bitcoin Association reported that the hack resulted in malicious double spending of fake BSV tokens. Daisy Li Decl. ¶ 5. At the time, the Company was not aware of Bitcoin

Association's announcement and the deposit/trading/withdrawal functions of BSV on BitMart were working as normal. The Company only came to know of Bitcoin Association's announcement on July 10, 2021. *Id.*, at ¶ 6.

On July 9, 2021, the BitMart exchange experienced a malicious hack between 2:30 pm to 10:00 pm. *Id.*, at ¶ 7. In that window, the hacker(s) registered 92 user accounts with BitMart and manipulated them to carry out trades using fake BSV tokens which the hacker(s) generated through a "51% attack" of the BSV network. *Id.*; Wei Li Decl. ¶¶ 6-12. The hacker(s) initiated deposits of BSV tokens mined on the private chain to the 92 user accounts they opened on BitMart. Daisy Li Decl. ¶ 8. These deposits went undetected by BitMart because its deposit verification system verified these tokens against the hackers' fraudulent records on the fake BSV blockchain which the hacker(s) created during the 51% attack. *Id.* As such, the hacker(s) managed to get BitMart to confirm these BSV tokens as proper deposits. *Id.* A total of 91,000 BSV tokens were deposited into the digital wallets linked with the 92 BitMart accounts that the hacker(s) opened. *Id.*

Once BitMart confirmed these deposits, the hackers immediately began using the deposited BSVs to trade for other cryptocurrencies on the exchange before withdrawing these cryptocurrencies from the exchange to other exchanges. *Id.*, at ¶ 9. A total of 91,000 BSV tokens mined from the hackers' private chain were deposited and used to procure other cryptocurrencies on the BitMart exchange that were worth approximately US $6.07 million:

| Cryptocurrency (Trading Symbol) | Number of Coins/Tokens |
|---|---|
| Bitcoin (BTC) | 11.106 |
| Ethereum (ETH) | 216.523 |
| Litecoin (LTC) | 668.196 |
| Cardano (ADA) | 130,780.8 |
| USDC (ERC-20) | 605,336 |
| USD Coin (USDC) | 283,984.407 |
| Polygon (MATIC) | 297,691 |

3

| | |
|---|---|
| Stellar (XLM) | 969,308.31 |
| Holo (HOT) | 29,912,899 |
| XRP (XRP) | 3,994,932.49 |

The Company only came to know of the hackers' suspect trading activities at about 10 pm on July 9, 2021. Very quickly, the Company identified the 92 accounts that were affected and froze them. *Id.*, at ¶ 10.

C. **Defendants transferred real cryptocurrencies "cashed out" of the fake ones deposited on BitMart to other cryptocurrency exchanges**

Immediately after selling the fake BSV for real cryptocurrencies listed for trading on BitMart, the hacker(s) transferred such cryptocurrencies out to other exchanges. BitMart has managed to identify numerous outgoing transfers to numerous cryptocurrency exchanges. *Id.* ¶ 10. So far, the Company has identified transfers to the following crypto exchanges, details of which transfers are set forth on Schedule B, hereto:

| Cryptocurrency Exchange | Entity that owns the Cryptocurrency Exchange | Number of Coins/Tokens |
|---|---|---|
| Binance | Binance Holdings Limited | At least 2 BTC and 21611,9 XRP. |
| Huobi | Huobi Global Limited | At least 969,784.13 XRP. |
| OKex | OKEX MALTA LTD | At least 24664.99 USDT. |
| Kucoin | Mek Global Limited | The number of cryptocurrencies being held is unknown, but transfers to this exchange are confirmed |
| Hitbtc | Hit Tech Solutions Development Ltd | The number of cryptocurrencies being held is unknown, but transfers to this exchange are confirmed |
| Nicehash | Nicehash Ltd | At least 135,217 XRP. |
| BW.com | Collinstar Holding Pty. Ltd. | The number of cryptocurrencies being held is unknown, but transfers to this exchange are confirmed. |
| Ascendex | BMXDM Technology Pte. Ltd. | At least 500 XRP. |

As a result of the Defendant's actions, BitMart has suffered losses worth about $5.27 million, mainly through refunding the cryptocurrencies to users who transacted with the hackers using their legitimate cryptocurrencies. Daisy Li Decl. ¶¶ 11.  BitMart did so to maintain its commercial relationship with its clients and to uphold its reputation.  *Id.*  Investigations are ongoing and BitMart has reported this attack to the FBI. *Id.* **Ex. B**. It has also engaged counsel to commence arbitration. *Id*.

Meanwhile, the Company has reached out to the other crypto exchanges where the cryptocurrencies were transferred to and requested a freeze of the affected accounts. *Id.,* at ¶ 12. Some of them have agreed to a temporary freeze out of goodwill. *Id.* However, these exchanges have also informed the Company that they need a court order to maintain the freeze, otherwise they would have no choice but to release the accounts. **Ex. C** (correspondence exchanged between BitMart and other exchanges such as Binance and Huobi). As such, ***time is of the essence*** and the Company has authorized its attorneys to move for a temporary restraining order to prevent the hackers from further transferring or trading using these cryptocurrencies which it procured through a malicious attack on the BSV network and the BitMart exchange. The Company seeks such injunctive relief to prevent irretrievable loss of the subject cryptocurrency while the arbitration is pending.

### III.     JURISDICTION

**A.     The Court Has Jurisdiction Because Defendants "Transacted Business" In State**

Section 302 of New York's CPLR governs specific jurisdiction. Under CPLR 02(a)(1), "a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent … transacts any business within the state or contracts anywhere to supply goods or services in the state."

"The showing necessary for a finding that a defendant 'transacted business' under Section 302(a)(1) is considerably less than the showing required for a finding that a defendant was 'doing business' under Section 301." *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 255 (S.D.N.Y. 2003). The New York State Court of Appeals has held that, under § 302(a)(1), "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Deutsche Bank Sec., Inc. v. Mont. Bd. of Inves.*, 7 N.Y.3d 65, 71 (N.Y. 2006). "Further, commercial actors may be subject to long-arm jurisdiction even when they have only used electronic and telephonic means to project themselves into New York to conduct business transactions." *Sandoval v. Abaco Club*, 507 F. Supp. 2d 312, 316 (S.D.N.Y. 2007) (internal citation and quotations omitted).

Numerous types of acts or transactions have been found sufficient to confer jurisdiction. *See e.g. Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168-169 (2d Cir. 2013) (use of a New York correspondent bank account to fund tortious acts elsewhere); *Hecklerco, LLC v. YuuZoo Corp.*, 252 F. Supp. 3d 369, 376 (S.D.N.Y. 2017) ("Defendants … engaged in a scheme to sell shares in New York through a U.S. entity, YZ, using agents that are domiciled in New York."); *RV Skincare Brands LLC v. Digby Invs. Ltd.*, 394 F. Supp. 3d 376, 381 (S.D.N.Y. 2019) ("A single act of shipping a [good] might well be sufficient, by itself to subject [a nondomiciliary] to the jurisdiction of a New York court under section 302(a)(1).") (citing *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 170 (2d Cir. 2010)); *Parke–Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 17 (1970) (finding jurisdiction where out-of-state defendant never entered New York, but participated in a live auction in New York by making one telephone call to New York and thus was "receiving and transmitting bids over an open telephone line.")

Here, GBM has been able to identify at least two fraudulent transactions by Defendants with two New York users of its cryptocurrency exchange. *See* Daisy Li Decl. ¶ 14. GBM has refunded those users and traced the cryptocurrency Defendants received through that transaction to another exchange. *Id.* ¶ 11. While GBM's investigation is still ongoing, there could be more users Defendants "transacted" with in New York, and certainly throughout the United States.

In *Schottenstein v. Schottenstein*, 2004 U.S. Dist. LEXIS 22648, at *47 (S.D.N.Y. Nov. 5, 2004), the court found that allegations that a non-domiciliary who does no business in New York but who had sold "a considerable number of shares on the New York Stock Exchange" permitted specific jurisdiction over conversion claims arising out of one $400,000 block of such sales. *See also Cooper v. N. Jersey Tr. Co.*, 250 F. Supp. 237, 240 (S.D.N.Y. 1965) (finding personal jurisdiction under CPLR 302(a) where "[i]t is also alleged by the plaintiff that the securities involved were sold by Reynolds & Co. on the New York and American Stock Exchanges in the City of New York, and that this constituted a tortious conversion of his property."); *Absolute Activist Master Value Fund, Ltd. v. Ficeto*, 2013 U.S. Dist. LEXIS 45883, at *43-45 (S.D.N.Y. Mar. 28, 2013) ("mastermind" who manipulated U.S. penny stocks "purposefully reached beyond his own domicile and into the U.S. to … and thereby made himself 'subject to regulation and sanctions' here."). Here Defendants' transactions in New York confer jurisdiction.

**B.     The Court has Jurisdiction Under CPLR § 302(a)(3) and the Commodities Exchange Act Based On *National* Contacts and Effects**

Even where no single-act of transacting business in the state is found, fraudulent or manipulative acts with foreseeable effects in New York, conducted entirely out-of-state, can still satisfy the requirements of specific jurisdiction under CPLR § 302(a)(3)(ii). This Circuit relies on the "effects test" to determine whether it can exercise specific jurisdiction over a defendant whose "conduct that forms the basis of the controversy occurs entirely out-of-forum," and whose "only

7

relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *Tarsavage v. Citic Tr. Co., Ltd.*, 3 F. Supp. 3d 137, 145 (S.D.N.Y. 2014). Pursuant to the effects test, "the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." *Id.*

Here, Defendants caused harmful, foreseeable effects within New York to at least one identified, but likely more users of GBM's exchange, which has New York-based operations. Defendants then transferred the cryptocurrency to other exchanges serving New York customers with the intent to sell them. If they are permitted to undertake such sales, they will almost certainly transact with New York-based counterparties. These tortious acts with foreseeable consequences in New York confers jurisdiction on the Court pursuant to CPLR § 302(a)(3)(ii).

Even if the Court finds that Defendants have not yet undertaken sales to New York users on the Schedule B exchanges, 302(a)(3) ***also*** permits the exercise of personal jurisdiction to order injunctive relief over ***contemplated*** acts that ***would*** convey jurisdiction upon the presiding court ***if*** consummated. As New York's Court of Appeals long ago held in *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197 (1978):

> Plaintiff is … entitled to invoke the [CPLR 302(a)(3)] jurisdictional statute to avert ***threatened harm*** ... As noted, the … facts give rise to the probable inference that there is a conscious ***plan*** to engage in unfair competition and misappropriation of trade secrets. That should be enough to justify application of CPLR 302 (subd. (a), par. 3). If a tort must already have been committed for jurisdiction to be available under the statute, then that section would never be usable by a plaintiff seeking anticipatory injunctive relief. Such a result is unacceptable.

*Id.* at 206 (emphasis added); *see also Four Seasons Solar Prod. Corp. v. Solarium Sys., Inc.*, 1987 WL 4818, at *3 (E.D.N.Y. May 6, 1987) (citing *Sybron* and denying a defendant's motion to dismiss for lack of personal jurisdiction given alleged ***anticipated*** injury in New York.); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*, 2004 WL 2199547, at *13 (S.D.N.Y.

8

Sept. 29, 2004) ("the threat of injury suffices to satisfy the 'injury' element of the statute."); *Am. Para Pro. Sys., Inc. v. LabOne, Inc.*, 175 F. Supp. 2d 450, 457 (E.D.N.Y. 2001) ("APPS, of course, need not wait for the threatened harm to occur before seeking judicial assistance. Indeed, the purpose of the injunctive relief is 'to prevent wrongs reasonably apprehended in the future.'")

Indeed, even if the Court finds New York contacts to be insufficient, the Commodities Exchange Act ("CEA") would provide personal jurisdiction to order injunctive relief based on ***national*** contacts and effects. Here, Bitcoin is a commodity. *See BDI Capital, LLC v. Bulbul Invs. LLC*, 446 F. Supp. 3d 1127, 1134 (N.D. Ga. 2020); *See also CFTC v. McDonnell*, 287 F. Supp. 3d 213, 217 (E.D.N.Y. 2018) ("A 'commodity' encompasses virtual currency both in economic function and in the language of the statute."); *Carmel v. Mizuho Bank*, 2019 U.S. Dist. LEXIS 233355, at *34 (C.D. Cal. Nov. 14, 2019) ("Bitcoin itself is a commodity, not a security.") BSV is a "fork" of Bitcoin and operates in fundamentally the same manner. Daisey Li Decl. ¶ 4.[1] Finally, Bitcoin SV, like bitcoin, operates by having "nodes" throughout the world process its on-chain transactions, and by far the largest portion of its "nodes" are in the United States.[2] Wen Li Decl. ¶¶ 4, 6, 10 (explaining the operation of nodes).

The CEA prohibits "manipulation of the price of any commodity or commodity future." *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 173 (2d Cir. 2013) (citation omitted). Section 6(c)(1) of the CEA, provides that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance." 7 U.S.C. § 9(1).

---

[1] *See* List of bitcoin forks - Wikipedia (last accessed July 23, 2021).
[2] *See* Bitcoin SV / Node explorer — Blockchair (showing the U.S. as the location of the largest proportion of nodes validating the BSV blockchain) (last accessed July 23, 2021).

"When the jurisdictional issue flows from a federal statutory grant … the Second Circuit has consistently held that the minimum-contacts test in such circumstances looks to contacts with the entire United States rather than with the forum state." *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, 2014 U.S. Dist. LEXIS 130677, at *53-54 (N.D.N.Y. Sep. 18, 2014). The CEA contains a nationwide service provision, 7 U.S.C. § 25(c), pursuant to which courts assess personal jurisdiction based on national contacts. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 526-27 (S.D.N.Y. 2008), aff'd, 730 F.3d 170 (2d Cir. 2013).

Accordingly, for purposes of jurisdiction under the CEA, "the relevant forum is the United States, not a particular district. Second Circuit authority dictates that a district court may exercise its personal jurisdiction in a securities action if the defendant's activities 'could reasonably be expected to be visited upon United States [cryptocurrency traders].'" *Donoghue v. Dicut, Inc.*, 2002 U.S. Dist. LEXIS 13542, at *5-6 (S.D.N.Y. July 24, 2002) (analyzing a parallel nationwide jurisdictional clause in the Securities Exchange Act). Here, Defendants undertook a massive hack of the BSV network—which is heavily-centered in the U.S.—in order to generate fake BSV and defraud at least 43 U.S. users of a U.S. cryptocurrency exchange. Daisy Li Decl. ¶ 14. Their acts violated the CEA, and furthermore, "create[e] the near certainty that United States shareholders … would be adversely affected by [their] transactions." *Donoghue*, 2002 U.S. Dist. LEXIS 13542, at *7. The Court can therefore assert jurisdiction under CPLR 302(a)(iii) and the CEA.

## IV. ARGUMENT

### A. Petitioner is Entitled to an *Ex Parte* Temporary Restraining Order Restraining Transfers of the Defrauded Cryptocurrency

Courts are "permitted to issue pre-arbitration injunctive relief in order to aid the arbitration process." *Leber*, 2019 WL 1331313, at *3. The standard for such an injunction is "the same as for preliminary injunctions generally." *Id.* Moreover, "[t]he standard for granting a temporary

restraining order and a preliminary injunction pursuant to Rule 65 of the Federal Rules of [Civil] Procedure are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002).

To obtain preliminary injunctive relief, a movant must show irreparable harm absent injunctive relief and either (1) likelihood of success on the merits or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Wright v. Giuliani*, 230 F.3d 543, 547 (2d Cir.2000); *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994).

### 1. Plaintiff Will Suffer Irreparable Harm in The Absence of The Requested Injunction

Cryptocurrency knows no borders and fluctuate wildly in price. Defendants are allowed to transfer cryptocurrency out of the exchange accounts they have been traced to, they will become more difficult, if not impossible, to recover. This is because open market sales on third party exchanges to third party bona fide purchasers would make it effectively impossible for a tribunal to order the transferred cryptocurrency to be disgorged. Here, Petitioner's very *ability* to secure such final relief depends on the requested injunction.

Courts have found a showing of irreparable harm where "'but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied.'" *O.D.F. Optronics Ltd. v. Remington Arms Co.*, 2008 WL 4410130 (S.D.N.Y. Sept. 26, 2008) (*quoting Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.1999). Furthermore, adverse consequences "that could not be adequately remedied after the fact" establish irreparable harm. *See Time Warner Cable v. Bloomberg L.P.,* 118 F.3d 917, 925 (2d Cir. 1997).

Finally, irreparable injury may be found where insolvency threatens to frustrate a damage award. In *Drobbin v. Nicolet Instrument Corp.,* 631 F. Supp. 860, 912 (S.D.N.Y.1986), the court enjoined the holders of certain shares and warrants from disposing of them because monetary damages would be an inadequate remedy. The court reasoned that the share and warrant holders do not have "sufficient assets to pay any damages to which [movant] would be entitled in lieu of the shares." *Id.* at 912. The court concluded that "[w]here a plaintiff's injury is theoretically compensable in money damages but, as a practical matter, the defendant would not or could not respond fully for those damages, preliminary injunctive relief has been deemed necessary to protect the plaintiff from irreparable injury." *Id.* Here, Defendants are foreign, impossible to identify hackers intent on fraud, there is almost no likelihood that they would pay a damage award. Short of freezing the already-identified, fraud-begotten cryptocurrency, no remedy exists.

### 2. Plaintiff Has Demonstrated a High likelihood of Success on The Merits

Because the arbitration is a premise of the injunctive relief sought here, the element of "likelihood of success is ... measured in terms of the likelihood of success in arbitration." *SG Cowen Sec. Corp. v. Messih*, 224 F.3d 79, 84 (2d Cir. 2000) (emphasis in original). Additionally, to establish a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent." *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (citations omitted). Here, the facts are clear: Defendants are hackers who deposited fake BSV into Petitioner's exchange to defraud users and the exchange. The likelihood of success on the merits is all but assured.

### 3. The Balance of Harms Tilts Sharply in Petitioner's Favor

The equities weigh in favor of granting GBM's request for injunctive relief. Conversely, Defendants would not suffer any harm since they are not entitled to sell stolen cryptocurrency.

**B.     Plaintiff is Entitled to an Order Authorizing Alternative Service of Process**

Fed. R. Civ. P. (4) governs service on Defendants in the instant matter since they are located abroad. Plaintiff may serve international defendants pursuant to Fed. R. Civ. P. (4)(f)(3), which enables a court to grant an alternative method of service so long as it "(1) is not prohibited by international agreement; and (2) comports with constitutional notions *of* due process." *SEC v. Anticevic,* No. 05 CV 6991 (KMW), 2009 WL 361739, at *3 (S.D.N.Y. Feb. 13, 2009).

Notably, "[s]ervice of process under Rule 4(f)(3) is neither a last resort nor extraordinary relief. It is merely one means among several which enables service of process on an international defendant." *Madu, Edozie & Madu, P.C. v. SocketWorks Ltd. Nigeria*, 265 F.R.D. 106, 115 (S.D.N.Y. 2010) (citation omitted); *see also Washington State Inv. Bd. v. Odebrecht S.A., 2018 WL 6253877*, at *3 (S.D.N.Y. Sept. 21, 2018) ("Courts have repeatedly recognized that there is no hierarchy among the subsections in Rule 4(f).") (*quoting In GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012)).  In particular, the Rule does not require a party to exhaust efforts to serve pursuant to Rules 4(f)(1) or 4(f)(2) before seeing an order under Rule 4(f)(3). *Jian Zhang v. Baidu.com Inc.*, 293 F.R.D. 508, 512 (S.D.N.Y. 2013) ("So long as those conditions are met, it should not, and does not, matter whether service was attempted pursuant to Rule 4(f)(1) or (2) and, if so, whether or why such service was unsuccessful.").

"The decision of whether to order service of process under Rule 4(f)(3) is 'committed to the sound discretion of the district court.'" *United States v. Lebanese Canadian Bank*, 285 F.R.D. 262, 266 (S.D.N.Y. 2012) (quoting *Madu*, 265 F.R.D. at 115); *see also In re S. African Apartheid Litig.*, 643 F. Supp. 2d 423, 433 (S.D.N.Y. 2009) ("A court is afforded wide discretion in ordering service of process under Rule 4(f)(3)."); *F.T.C. v. PCCare247 Inc.*, 2013 WL 841037, at *3 (S.D.N.Y. Mar. 7, 2013) ("[T]he advisory notes [to Rule 4] suggest that in cases of 'urgency,' Rule

13

4(f)(3) may allow the district court to order a 'special method of service,' even if other methods remain incomplete or unattempted.")

### 1. Defendants Have Contractually Agreed to The Alternative Means of Service

Freedom of contract is "deeply rooted" in public policy in this district. *Kramer v. Lockwood Pension Servs., Inc.*, 653 F. Supp. 2d 354, 378 (S.D.N.Y. 2009), and a right of constitutional dimension (*see* U.S. Const, art. I, § 10[1]; *see 159 MP Corp. v. Redbridge Bedford, LLC,* 33 N.Y.3d 353, 359 (2019)). "Generally, parties may contract as they wish and the courts will enforce their agreements without passing on the substance of them." *New England Mut. Life Ins. Co. v. Caruso,* 73 N.Y.2d 74, 81 (1989).

In the context of contractual consent to alternative means of service, although "[o]rdinarily a court can acquire jurisdiction of the person of a defendant only by service of process within the jurisdiction of the court," the rule "does not apply where the defendant has agreed in advance to accept, or does in fact accept, some other form of service as sufficient." *Pohlers v. Exeter Mfg. Co.*, 293 N.Y. 274, 279 (1944) (citation omitted); *see also Alfred E. Mann Living Tr. v. ETIRC Aviation S.a.r.l.*, 910 N.Y.S.2d 418, 421 (1st Dep't 2010). Under those circumstances, it is a defendant's consent, as opposed to a defendant's relationship with the territorial jurisdiction, "which imparts power," *Gilbert v. Burnstine*, 255 N.Y. 348, 355 (1931) (enforcing an arbitration agreement pursuant to which the parties consented to a particular notice procedure as set forth in an English statute.)

Here, GBM's user agreement with Defendants contained an explicit consent stating that "You agree and consent to receive electronically all communications, agreements, documents, notices and disclosures … that we provide in connection with your BitMart Account(s) and your use of BitMart Services." **Ex. D**, at 28. Such contractual provision for service "will be upheld in

14

the absence of prejudice." *New York Merchants Protective Co. v. Backyard Party Tent Rental, Inc.*, 939 N.Y.S.2d 220, 221 (2d Dep't 2011); *see also Nat'l Equip. Rental, Ltd. v. Graphic Art Designers Inc.*, 234 N.Y.S.2d 61, 63 (Sup. Ct. 1962) (upholding contractual designation of an agent to receive service of process.) Defendants' agreement to receive all notices related to their use of BitMart's services and their accounts by e-mail entitles Petitioner to serve this TRO petition by e-mail. Indeed, the hackers have left no trace of any way to contact them other than the e-mails they agreed by contract to provide—making e-mail the ***only*** way to serve them.

### 2. Proposed alternative means of service comport with due process

"Due process does not require actual receipt of notice before a person's liberty or property interests may be adjudicated; it is sufficient that the means selected for providing notice was 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Beckman v. Greentree Sec., Inc.*, 87 N.Y.2d 566, 570 (1996) (*quoting Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Here, service by email is reasonably calculated to provide defendants with notice of future filings in this case.

*First*, numerous courts have held that service by email does not violate any international agreement where the objections of the recipient nation are limited to those means enumerated in Article 10. *See, e.g., Gurung*, 279 F.R.D. at 220; *Philip Morris USA Inc. v. Veles Ltd.*, 2007 WL 725412, at *3 (S.D.N.Y. Mar.12, 2007) (authorizing e-mail service as an appropriate means of service under Rule 4).

*Second*, service by email alone comports with due process where a plaintiff demonstrates that the email is likely to reach the defendant. *Gurung v. Malhotra*, 279 F.R.D. 215, 220 (S.D.N.Y. 2011); *see also Philip Morris*, 2007 WL 725412, at *3 (authorizing service by email where

15

"defendants … correspond regularly with customers via email" and rejecting "[d]efendants' objections about theoretical reliability of email service" where plaintiff "amply demonstrated the high likelihood that defendants would receive and respond to email communications"); *S.E.C. v. Lines*, 2009 WL 2431976, at *2 (S.D.N.Y. Aug. 7, 2009) (permitting service by email where the plaintiff demonstrated that the defendant had "used his email address as recently as last year"). Defendants agreed to be notified via email for any correspondence in respect to this Agreement, and provided their corresponding email addresses on the Agreement, which was recently signed in 2020. This contract provision demonstrated a high likelihood that Defendants will receive and respond to emails sent to these addresses. *See Gurung*, 279 F.R.D. at 220; *Phillip Morris*, 2007 WL 725412, at *3.

Lastly, Given the expedited and urgent nature of the relief requested, denying alternative service here would essentially provide Defendants with extensive opportunities to sell the stolen cryptocurrency on the open market. As set forth above, Defendants having left no trace of who they are or other identifying information other than e-mails which they used to register accounts with BitMart, this is also the only method of serving Defendants.

## V. NO BOND IS NECESSARY AT THIS STAGE

It is well-settled that a district court has "wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm." *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F.Supp.2d 305, 345 (S.D.N.Y.2010) (citations omitted); *see also Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976). When a defendant is "highly unlikely to prevail in arbitration," that "militates against the posting of ***any*** bond. *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) (emphasis in original). Here, Defendants are only being prevented from profiting

from cryptocurrency they do not legally own, given the low likelihood of harm to Defendants and Petitioner's high likelihood of success, no bond should be necessary.

## VI. CONCLUSION

For the reason set forth above, Plaintiff respectfully requests that its Petition for a TRO be granted in its entirety, and the concurrently submitted proposed Show Cause Order be issued.

Dated: July 23, 2021.

Angus F. Ni

By: _____

**AFN LAW PLLC**
41 Madison Ave, 31st Floor,
New York, NY 10017
(646) 453-7294
angus@afnlegal.com
*Attorneys for Plaintiff*